# Illinois Official Reports

## Appellate Court

---

### *Price v. City of Chicago*, 2018 IL App (1st) 161599

---

| | |
|---|---|
| Appellate Court Caption | PRISCILLA PRICE, Independent Administrator of the Estate of Niko Husband, Deceased, Plaintiff-Appellant, v. THE CITY OF CHICAGO, a Municipal Corporation, and MARCO PROANO, Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-16-1599 |
| Filed | February 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-10162; the Hon. Elizabeth M. Budzinski, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Donald A. Shapiro and Matthew R. Bassinger, of Donald A. Shapiro, Ltd., of Chicago, and Michael T. Reagan, of Law Offices of Michael T. Reagan, of Ottawa, for appellant.<br><br>Edward N. Siskel, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Stephen G. Collins, Assistant Corporation Counsel, of counsel), for appellees. |

JUSTICE SIMON delivered the judgment of the court, with opinion.
Justices Harris and Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1    Niko Husband was shot and killed by Chicago police officer Marco Proano. This case was filed by the administrator of Husband's estate seeking damages for wrongful death. Officer Proano and the City of Chicago countered that the shooting was justified under Illinois law. The jury returned a general verdict against the defendants, and in favor of plaintiff, for $3.5 million. The jury also answered two special interrogatories.

¶ 2    The first special interrogatory asked whether Officer Proano "reasonably believe[d] that Niko Husband's actions placed him or his fellow officers in imminent threat of death or serious bodily harm" when he shot Husband. The jury answered "Yes." The second special interrogatory asked whether Officer Proano's "conduct in shooting Niko Husband [was] willful and wanton." The jury answered "Yes." Finding that the answer to the first special interrogatory controlled the verdict, the trial court entered a judgment of no liability in favor of defendants. We reverse.

¶ 3                                BACKGROUND

¶ 4    On July 17, 2011, nineteen-year-old Niko Husband went to a dance party at 80th Street and Ashland Avenue with his friends. The organizers of the event rented a fraternal lodge and provided security. Attendees were patted down by security as they entered the party. There was no alcohol served. A disc jockey played music and everyone was dancing. But the party ended abruptly when police arrived and announced to the crowd that the party was over.

¶ 5    Chicago police officer Marco Proano and his team had received a radio call that a man with an AK-47 was running towards 80th Street and Ashland Avenue—the same location as the dance party. The radio call identified the suspect with the AK-47 as a black male with dreadlocks wearing a white shirt and white or khaki shorts. The officers approached the party and told the security guards that they were looking for a man with an AK-47. The security guards told the officers that the suspect was not inside because they patted down everyone prior to entry. The police ended the party and searched partygoers as they exited.

¶ 6    As Husband exited the party, he was positioned immediately behind and had his arms around a female friend, Keoni Jackson. Husband was wearing a bright green T-shirt and blue jeans. Officer Proano testified that he knew Husband did not meet the description of the suspect from the radio call. However, in Officer Proano's judgment and the judgment of other officers, Jackson appeared distressed or panicked by Husband's contact. The officers instructed Husband to take his arms off Jackson and to let her go. Husband did not obey the order. Officer Whigham testified that Husband shoved him and refused to let go of Jackson. Officers threw both Husband and Jackson against the wall and started to forcefully separate them. A struggle ensued.

¶ 7    Officer Proano testified that when he put his arm between Husband and Jackson, he felt a gun around Husband's waist area and then placed his left hand directly on the gun. Husband's T-shirt was covering the gun. Officer Proano testified that he could not pull the weapon from

Husband's waistband due to the struggle but yelled out "gun, gun, gun, he's got a gun" to alert his fellow officers. Officer Whigham used his Taser three or four times on Husband causing him to the fall to the floor on his back. At this time, Officers Proano, Whigham, and Piper were directly involved in the struggle with four other officers surrounding them in close proximity.

¶ 8    Crouched over Husband, the three officers attempted to gain control of his arms to prevent Husband from reaching into his waistband. Officers testified that Husband flailed violently and uncontrollably. The officers were unable to subdue Husband.

¶ 9    Officer Proano testified that he saw Husband prop himself up with his elbows and reach into his waistband. Officer Proano testified that Husband then pulled out a gun and pointed it at Officer Piper, so he shot Husband three times in the chest. All three officers involved in the struggle testified that they believed Husband was going to shoot Officer Piper before being shot by Officer Proano. Husband died within seconds.

¶ 10   The testimony of officers described the scene as chaotic and difficult to control. Officer Proano testified that the number of people at the scene was in the hundreds. As the struggle between Husband and the officers intensified, so did the officers' concerns about crowd control. Officers described being surrounded by the crowd and even believed that the crowd might try to get involved in the struggle with Husband.

¶ 11   The issue of whether Husband actually had a gun was hotly contested by plaintiff at trial. The three officers attempting to subdue Husband claim that they saw him pull a gun and point it at Officer Piper. The other four officers on the scene did not see Husband with a weapon. Jackson and Husband's friend testified that he did not have a gun and that they did not see a gun in Husband's waistband as he danced at the party with his shirt off.

¶ 12   Plaintiff questioned the chain of custody of the gun that Husband was accused of possessing the night he died. After Husband was shot, Officer Piper claims to have taken the gun from Husband's hand and made contact with his sergeant, Phillip Orlando. Officer Piper told Sergeant Orlando that Husband had "just pointed a gun at me." Sergeant Orlando testified that he saw Officer Piper holding a gun and took the gun from him because he wanted Officer Piper to have some time to relax. Sergeant Orlando did not see the shooting.

¶ 13   Sergeant Orlando then testified that he placed the gun taken from Officer Piper on the driver seat of his vehicle. Sergeant Orlando ordered Officer Proano to stay with the vehicle. Seeing the gun sitting on the driver's seat, Officer Proano testified that he picked up and put the gun in his waistband because he was afraid someone might break into the car and take the gun. Officer Proano testified that he gave the weapon to a police forensic investigator about an hour later.

¶ 14   The recovered gun was a semi-automatic with a single round in the chamber. No physical evidence tied the gun to Husband. The only evidence that Husband had a gun was the testimony of the three officers who attempted to subdue him. A postmortem examination revealed that Husband did not have any drugs or alcohol in his system at the time of the shooting. An internal police investigation of the shooting did not contradict, nor did it confirm, the accounts of whether Husband pointed a gun at a police officer.

¶ 15   Plaintiff, as the administrator of Husband's estate, filed this wrongful death case. Plaintiff presented expert testimony analyzing the police officers' conduct in an attempt to demonstrate that the officers' actions were inconsistent with Husband having a gun. The expert testimony also covered the way in which the police officers handled the weapon taken from Husband

immediately after the shooting. Defendants argued that Officer Proano's use of force was in conformity with state law.

¶ 16 At this point, the issue on appeal comes into focus. After the parties concluded their presentations of the evidence to the jury, the trial court instructed the jury as to the applicable law to be used in deliberation. The court instructed, that in order to find for the plaintiff, the jury must find that Officer Marco Proano's actions were "willful and wanton in the following respect: [that he] shot Niko Husband without legal justification." The court also instructed the jury that Officer Proano would have been "legally justified in the use of force likely to cause death or great bodily harm [but] only when he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another."

¶ 17 The parties also tendered two special interrogatories to the jury. Special interrogatory No. 1 asked the jury "When Officer Proano shot Niko Husband did Officer Marco Proano reasonably believe that Niko Husband's actions placed him or his fellow officers in imminent threat of death or serious bodily harm?" Special interrogatory No. 2 asked the jury "Was officer Proano's conduct in shooting Niko Husband willful and wanton?"

¶ 18 The jury returned a general verdict in favor of plaintiff and awarded $3.5 million in damages. The jury answered "yes" to both special interrogatories. The trial court found that the jury's answer to the first special interrogatory controlled the general verdict. The trial court entered judgment in favor of defendants, holding that the jury's special finding that Officer Proano's belief that Husband's actions placed him or his fellow officers in imminent threat of death or serious bodily harm required the general verdict to be set aside.

¶ 19 Plaintiff filed a posttrial motion arguing that the "Yes" answer to special interrogatory No. 1 did not control the general verdict, could be reconciled with the general verdict and did not determine that the shooting was legally justified. The trial court rejected plaintiff's arguments, and plaintiff appeals.

¶ 20                                              ANALYSIS

¶ 21 The issue on appeal is whether the answer to special interrogatory No. 1 controls the general verdict such that the general verdict cannot stand. We review the issue *de novo*. *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 6 (2007).

¶ 22 At the outset, we address defendants' contention that plaintiff waived any argument as to the form of special interrogatory No. 1 by agreeing to its presentation to the jury. It is "beyond dispute that a failure to specifically object to a special interrogatory when proffered at the instructions conference will ordinarily waive any claim of error in the giving of that special interrogatory." *La Pook v. City of Chicago*, 211 Ill. App. 3d 856, 864 (1991). Because the plaintiff cannot complain of an error on appeal "to which that party consented," plaintiff is bound by the jury's special finding. (Internal quotation marks omitted.) *Ahmed v. Pickwick Place Owners' Ass'n*, 385 Ill. App. 3d 874, 888 (2008). Any argument as to the trial court's submission of special interrogatory No. 1 to the jury in its agreed form is waived.

¶ 23 Because a special finding will be deemed to control the general verdict only if it is inconsistent with it, we turn to the merits of plaintiff's argument that the jury's special finding was not inconsistent with the general verdict. *Struthers v. Jack Baulos, Inc.*, 52 Ill. App. 3d 823, 825 (1977).

¶ 24    Special interrogatories are governed by section 2-1108 of the Code of Civil Procedure, which states that, "[w]hen the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2012). An inconsistency between a general verdict and a special interrogatory should be found only when the special finding is clearly and absolutely irreconcilable with the general verdict. *Powell v. State Farm Fire & Casualty Co.*, 243 Ill. App. 3d 577, 581 (1993). If a special interrogatory does not cover all the issues submitted to the jury and a reasonable hypothesis exists that allows the special finding to be construed consistently with the general verdict, they are not absolutely irreconcilable and the special finding will not control. *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 112 (2005). All reasonable presumptions must be exercised in favor of the general verdict. *Kessling v. United States Cheerleaders Ass'n*, 274 Ill. App. 3d 776, 779-80 (1995).

¶ 25    The law that governs a party's liability is instructive as to whether a special finding is inconsistent with, and thereby controls, a general verdict. Here, both parties and the trial court agreed that law of legal justification, as codified, controlled the outcome of the case:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2012).

¶ 26    The statute applies equally in both criminal and civil case*s. First Midwest Bank of Waukegan v. Denson*, 205 Ill. App. 3d 124, 129 (1990). In order to prove legal justification by way of self defense, the evidence must show (1) that force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. *People v. Stokes*, 185 Ill. App. 3d 643, 655-56 (1989). Whether a killing is justified under the law of self-defense is a question of fact for the jury to decide. *First Midwest Bank of Waukegan*, 205 Ill. App. 3d at 129.

¶ 27    Plaintiff draws the court's attention to the fact that the words "necessary to prevent" are found in the justification statute and missing from special interrogatory No. 1. This absence, plaintiff argues, left the issue of whether Officer Proano's use of deadly force was reasonably necessary unresolved and rendered the special finding not solely determinative of legal justification. Plaintiff argues that the general verdict resolves the issue in the negative and a reasonable hypothesis exists such that the special finding is not inconsistent with the general verdict. We agree.

¶ 28    The jury's response to special interrogatory No. 1 was not solely determinative of whether Officer Proano's actions were justified and a reasonable hypothesis consistent with the general verdict exists. The general verdict therefore controls.

¶ 29    The jury was properly instructed as to the law that controlled the outcome of this case. At the instructions conference, the trial court correctly identified the determinative issue: "there's one single issue: Whether or not Proano was justified in shooting. There's no other issue." The

trial court instructed the jury as to that issue accordingly and defined both willful and wanton conduct and legal justification:

> "The Plaintiff claims that the defendant Marco Proano, and the defendant City of Chicago through Marco Proano, were willful and wanton in the following respect: shot Niko Husband without legal justification."

> "When I use the expression "willful and wanton conduct" I mean a course of action which shows actual or deliberate intention to harm, without legal justification."

> "A police officer is legally justified in the use of force likely to cause death or great bodily harm only when he reasonably believes that such force in necessary to prevent imminent death or great bodily harm."

¶ 30    Before the jury could enter a general verdict in favor of Plaintiff, the trial court instructed that the jury must find, in pertinent part:

> "First, that the defendant acted or failed to act in the way claimed by the Plaintiff as stated to you in these instructions and that in so acting, or failing to act, defendant Marco Proano engaged in willful and wanton conduct without legal justification."

¶ 31    The jury deliberated and returned a general verdict for plaintiff, and against defendants, in the amount of $3.5 million. At this point, the jury's decision was clear; Officer Proano shot Niko Husband without legal justification. The jury also answered special interrogatories.

¶ 32    After reading special interrogatory No. 1, submitted by defendants, the jury answered "Yes," when Officer Proano shot Niko Husband he had a reasonable belief that Husband's actions placed him or his fellow officers in imminent threat of death or serious bodily harm. The jury read special interrogatory No. 2, tendered by plaintiff, and answered "Yes," Officer Proano's conduct in shooting Niko Husband was willful and wanton. The trial court vacated the general verdict and entered judgment for defendants believing that the jury's affirmative answer to special interrogatory No. 1 was inconsistent with the general verdict. The trial court denied plaintiff's posttrial motion and reasoned that, even if the special finding did not cover all of the issues submitted to the jury, the inclusion of the legal justification instruction into special interrogatory No. 1 solidified the inconsistency. We disagree.

¶ 33    It is well settled that a court cannot look to the evidence to determine whether a special finding is inconsistent with a general verdict. *Wicks v. Cuneo-Henneberry Co.*, 319 Ill. 344, 350 (1925). We therefore do not decide the question whether, when Officer Proano reasonably believed himself and his fellow officers to be under imminent threat of death or great bodily harm, his use of force was unreasonably disproportionate to that applied by Husband. Nor do we endeavor to determine whether the force exerted was reciprocal. Such a decision would cause this court to invade the province of the jury and rule with the "20/20 vision of hindsight" in the "peace of a judge's chambers." (Internal quotation marks omitted.) *Graham v. Connor*, 490 U.S. 386, 396 (1989).

¶ 34    We hold that the affirmative answer to the question left unresolved by the special finding, whether Officer Proano's decision to kill Husband was reasonably necessary to prevent the amount of force he faced, was indispensable to the jury's determination that Officer Proano's actions were justified under section 7-1(a) of the Criminal Code of 2012 (720 ILCS 5/7-1(a) (West 2012)).

¶ 35    An individual may not use force in excess of that necessary to protect himself or another. *People v. Jordan*, 130 Ill. App. 3d 810, 812 (1985). The decisive question is whether the

defendant's belief that it was necessary to use deadly force was reasonable under the circumstances. *People v. Holman*, 2014 IL App (3d) 120905, ¶ 58. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The reasonableness of an individual's belief that it was necessary to use deadly force to prevent death or great bodily harm raises a question of fact. *Jordan*, 130 Ill. App. 3d 810 at 812.

¶ 36     A justifiable use of deadly force in self-defense requires a jury to find that a person was *both* reasonable in believing that (1) deadly force was necessary to prevent death or great bodily harm and that (2) death or great bodily harm was imminent. 720 ILCS 5/7-1(a) (West 2012); *People v. Moleterno*, 199 Ill. App. 3d 15, 21 (1990).

¶ 37     There is no dispute that the evidence in this case painted a picture of an intimate struggle between the three officers and Husband prior to his death. Officer Whigham testified that he used his Taser on Husband three or four times and Husband fell to the ground on his back. Officer Proano stood around Husband's left shoulder area, Officer Whigham was on Husband's left side between his knee and waist, and Officer Piper was by Husband's feet. All three officers were in a crouched position. Officer Proano testified that while Husband was on the ground, he "was just flailing his arms around" and was "like a fish out of water," in that he was "just pulling, shoving, just lifting his arms and trying to get up." What happened next served as the factual crux of the case.

¶ 38     Officer Proano testified that he saw Husband prop himself up with his elbows and reach into his waistband. With his right hand, Husband pulled out a gun. Husband then pointed the gun at Officer Piper. Officer Proano shot Husband before he could shoot Officer Piper.

¶ 39     Plaintiff argued to the jury that Husband's pulling and pointing a gun at Officer Piper was a fabrication manufactured post-hoc to justify an unjustified killing. Defendants argued the opposite; the officers' testimony was truthful and Officer Proano saved Officer Piper's life.

¶ 40     It was for the jury to decide who to believe and whether the intimate contact between Husband and the three officers placed Officer Proano in such a position that deadly force was unjustified. "[I]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony." (Internal quotation marks omitted.) *Redmond v. Socha*, 216 Ill. 2d 622, 652 (2005). All reasonable presumptions exercised in favor of the general verdict and nothing given in aid of the special finding, the jury could have determined Officer Proano's killing of Husband to be unjustified given his physical proximity to Husband and potential ability to use less than deadly force to avoid the harm posed to Officer Piper.

¶ 41     Special interrogatory No. 1 dispensed with an issue of ultimate fact indispensible to a finding that Officer Proano was justified when he shot Husband. In doing so, the jury's special finding left the question of whether Officer Proano's decision to kill Husband was reasonably necessary under the circumstances open and the general verdict is deemed to have answered the question in the negative. A reasonable hypothesis exists that, despite Officer Proano's reasonable belief that he and his fellow officers were under imminent threat of death or great bodily harm, the jury *may* have determined that his decision to use deadly force was not reasonably necessary to prevent the threat he faced.

¶ 42    The defendants argue that any decision that the special finding is not solely determinative of legal justification would constitute a first time holding that self-defense using deadly force might be unjustified against the most dangerous threat a person can face. The defendants' position presupposes that the jury believed their theory of the case and the testimony of the three police officers. We are neither inclined, nor at liberty, to consider the evidence in such a manner.

¶ 43    The defendants proclaim that "it is a bedrock principle of self-defense that a person who is threatened may respond proportionally to defend against that threat." The proclamation highlights that which was missing from special interrogatory No. 1 and the issue the jury was thereby unable to resolve; that the threat posed by Husband's actions was met with a reasonably and necessarily proportionate response by Officer Proano. The fact that the jury answered special interrogatory No. 1 in the positive is not a *per se* adoption by the jury of defendants' case and series of events as told by the three officers. As such, the bedrock principle of self-defense remained unaddressed by the defendants' proffer of, and the jury's answer to, special interrogatory No. 1. We construe the presentation of a nondeterminative special interrogatory as against the proffering party. *Bilderback v. Admiral Co.*, 227 Ill. App. 3d 268, 271 (1992).

¶ 44    Because the jury's special finding was nondeterminative of an ultimate issue of material fact indispensible to a jury's determination that a person's actions are justified pursuant to section 7-1(a) and a reasonable hypothesis exists capable of reconciling the special finding with general verdict, the two are not absolutely irreconcilable and the general verdict controls.

¶ 45    Though our holding stands unaided by the jury's affirmative answer to special interrogatory No. 2, this court cannot agree with the defendant's assertion that because the jury's special finding is consistent with the general verdict, it is "meaningless."

¶ 46    Special interrogatory No. 2 asked the jury whether Marco Proano's conduct in shooting Husband was willful and wanton. Because the jury instructions correctly defined willful and wanton conduct as including the words "without legal justification," and correctly defined legal justification by itself, special interrogatory No. 2 properly covered the issue of legal justification when read in conjunction with the jury instructions. This reasoning was employed by the court in *Smilgis v. City of Chicago*, 97 Ill. App. 3d 1127, 1130 (1981), where a special interrogatory questioning the ultimate issue of plaintiff's freedom from contributory negligence was found to have properly covered the issue of proximate causation when the jury instructions, which correctly defined contributory negligence as inclusive of the correctly and separately defined term of proximate causation, were read in conjunction with the special interrogatory.

¶ 47    The jury's affirmative answer to special interrogatory No. 2, therefore, when read in conjunction with the jury instructions, resolved the issue left unresolved by the jury's answer to special interrogatory No. 1 without looking to the general verdict; Officer Proano's use of deadly force was not justified. "It is presumed the jury better understood the narrowly tailored issue presented in the special interrogatory, and the special verdict is, therefore, a more accurate reflection of the jury's determination." *Kosrow v. Acker*, 208 Ill. App. 3d 143, 146 (1991).

¶ 48    We note that the trial court cited *Smiglis* in support of its holding that a reading of the jury instructions in conjunction with the jury's answer to special interrogatory No. 1 resolved the issue of whether Officer Proano's deadly force was justified. 97 Ill. App. 3d at 1130. But the

jury instructions could not read words into special interrogatory No. 1 that were missing. As such, the answer to special interrogatory No. 1 remains nondeterminative even when read together with the defined terms contained in the instruction to the jury.

¶ 49 The parties further dispute whether plaintiff has argued a different theory of the case on appeal than presented to the jury. "It is well settled that the theory under which a case is tried in the trial court cannot be changed on review." *Ahmed*, 385 Ill. App. 3d at 887. To allow a party to change his or her trial theory on review would weaken the adversarial process and the system of appellate jurisdiction and could also prejudice the opposing party, who did not have an opportunity to respond to that theory in the trial court. *Id.*

¶ 50 Defendants argue that only after the trial court vacated the general verdict did plaintiff argue, for the first time, that Officer Proano's use of force was not reasonably necessary under the circumstances. Defendants cast plaintiff's first theory of the case as confined to the argument that Officer Proano was unreasonable in his belief that death or great bodily harm was imminent because Husband never pulled or pointed a gun. Defendants also highlight the testimony of plaintiff's expert, Dennis Waller, who testified that if an officer has a reasonable fear of imminent death or great bodily harm to himself and others he is fully justified in discharging his weapon to stop that threat.

¶ 51 We hold that plaintiff did not advance such a different theory of the case to the jury as to analogize her actions with those of the plaintiff in *Ahmed* and find that plaintiff sufficiently argued to the jury that Officer Proano's use of deadly force was not reasonably necessary under the circumstances because Husband never pointed a gun at Officer Piper or never possessed a weapon in the first place.

¶ 52 Having found that the general verdict controls, we decline to address defendants' argument that plaintiff has waived consideration of whether the special finding was against the manifest weight of the evidence.

¶ 53 CONCLUSION

¶ 54 The trial court should have entered judgment in favor of plaintiff. Accordingly, the judgment entered in favor of the defendants is reversed. The trial court is directed to enter judgment in favor of plaintiff consistent with the general verdict.

¶ 55 Reversed and remanded with directions.